UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

CIC-TOC PENSION PLAN; MICHAEL PIETI
AND RODGER GLOS, TRUSTEES OF THE
CIC-TOC PENSION FUND,

                Plaintiffs,

        v.

WEYERHAEUSER COMPANY,

                Defendant.

No. 3:12-cv-00527 –ST (LEAD)
No. 3:12-cv-00555-ST (Trailing
Case)
CONSOLIDATED CASES


OPINION AND ORDER

_____

WEYERHAEUSER COMPANY, a
Washington corporation,

                Plaintiff,

        v.

CIC-TOC PENSION PLAN,

                Defendant.


STEWART, Magistrate Judge:

///

///


1 – OPINION AND ORDER

## INTRODUCTION

On May 20, 2009, Weyerhaeuser Company ("Weyerhaeuser") closed a trucking facility in Albany, Oregon ("Albany facility"). This case involves a dispute over whether, as a result of that closure, Weyerhauser owes over $5.5 million to the CIC-TOC Pension Plan ("Plan" or "Fund") under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 USC §§ 1381-1461.

In 1974, Congress enacted the Employee Retirement Income Security Act ("ERISA"), a pension plan termination insurance program through which the Pension Benefit Guaranty Corporation ("PBGC"), a wholly owned Government corporation, "collects insurance premiums from covered pension plans and provides benefits to participants in those plans if their plan terminates with insufficient assets to support its guaranteed benefits." *Pension Benefit Guarantee Corp. v. R.A. Gray & Co.*, 467 US 717, 720 (1984). However, the PBGC issued a report finding that "ERISA did not adequately protect plans from the adverse consequences that resulted when individual employers terminate their participation in, or withdraw from, multiemployer plans." *Id* at 722. Provisions contributing to this problem included those which exonerated employers from liability for unfunded benefits if the plan survived for five years after the employer withdrew. Employers "were withdrawing from multiemployer plans on the gamble that the plan would survive for five years after their departure," prompting Congress to enact the MPPAA in 1980 amending ERISA and providing special withdrawal liability rules for multiemployer pension plans. *Crown Cork & Seal v. Central States Pension Fund*, 982 F2d 857, 861 (3rd Cir 1992).

The MPPAA imposes withdrawal liability on an employer if the employer completely or partially withdraws from a multiemployer pension plan with an unfunded vested benefit liability.

29 USC § 1381(a).  The withdrawal liability of an employer to a plan "is the . . . allocable amount of unfunded vested benefits," adjusted by certain amounts specified in ERISA.  29 USC § 1381(b)(1).  A complex formula determines the amount of withdrawal liability, essentially requiring a withdrawing employer to pay a *pro rata* share of any outstanding unfunded vested benefit liability at the time of the withdrawal.  29 USC § 1381(b).  However, withdrawal liability is calculated "as of the last day of the plan year preceding the year during which the employer withdrew" rather than "as of the day the employer withdraws."  *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 US 414, 417-18 (1995), citing 29 USC § 1391. That statutorily mandated calculation rule – which makes a $5.5 million difference to the parties in these consolidated cases – is apparently one of "administrative convenience" selected because it "permits a plan to base the highly complex calculations upon figures that it must prepare in any event for a report required under ERISA . . . thereby avoiding the need to generate new figures tied to the date of actual withdrawal."  *Id* at 418.

The MPPAA provides for mandatory arbitration of disputes over withdrawal liability. 29 USC §1401(a).  Following arbitration, an adversely affected plan fiduciary, employer, plan participant, or beneficiary may bring an action for appropriate legal or equitable relief in the United States District Court in the district where the plan is administered.  29 USC §1451(a)-(d).

After Weyerhaeuser closed its Albany facility and was assessed withdrawal liability by the Plan, it initiated arbitration with the Multiemployer Pension Plan Withdrawal Liability Tribunal of the American Arbitration Association ("AAA").   On March 1, 2012, the arbitrator issued a Final Arbitration Award in AAA Case No. 75 621 00020 11 DECR finding that Weyerhaeuser owes withdrawal liability to the Plan of over $5.5 million ("Award").  Complaint, Ex. 1.  In these consolidated cases, the parties seek to have that Award either enforced (*CIC-*

*TOC Pension Plan, et al. v. Weyerhaeuser Co.*, Civil No. 3:12-cv-00527-ST (Lead Case)) or vacated (*Weyerhaeuser Co. v. CIC-TOC Pension Plan*, Civil No. 3:12-cv-00555-ST (Trailing Case)) pursuant to ERISA, 29 USC § 1401(b)(2).

The sole issue involves the applicability of a single statutory provision, ERISA § 4212, 29 USC § 1392(c), to Weyerhaeuser's closure of the Albany facility. That provision provides that withdrawal liability applies "[i]f a principal purpose of any transaction is to evade or avoid liability." The Plan contends that Weyerhaeuser's decision to close the Albany facility on May 29, 2009, a mere two days before the end of the June 1, 2008 – May 31, 2009 Plan year, constituted a "transaction to evade or avoid" withdrawal liability in violation of that provision. Weyerhaeuser raises a number of arguments which it contends entitles it to have the arbitrator's Award vacated and to be awarded a refund of the payments it has already made toward this disputed withdrawal liability.

This court has jurisdiction under 28 USC § 1331 and 29 USC § 1451(c). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). For the reasons that follow, the Award in favor of the Plan is VACATED.

## **STIPULATED FACTS**

The parties stipulated to the following facts during the arbitration proceedings (Schwartz Decl. (docket #18), Ex. A):

1. Weyerhaeuser is a timberland, pulp, building material manufacturing, and homebuilding company, with international headquarters in Federal Way, Washington.

2. The Plan is a multiemployer, Taft-Hartley trust fund subject to ERISA and other applicable federal law, administered by a joint labor-management Board of Trustees ("Board").

The Fund's administrative offices are in Portland, Oregon, where its Board meets. The Fund's fiscal year runs from June 1 to May 31.

3.  Weyerhaeuser became a participating employer in the Fund during the plan year that commenced on June 1, 1999, when it acquired Willamette Industries, which had been a participating employer in the Fund since at least the early 1960's and since 1974 for the Albany Trucking division. Thereafter, Weyerhaeuser made pension contributions to the Fund on its employees' covered hours at various facilities, including the Albany Facility.

4.  Weyerhaeuser shut down several facilities in the Pacific Northwest in response to a declining market in wood products beginning in 2007. Those closures included facilities covered by the Plan – namely, facilities located in Bauman, Lebanon, Coburg, and Dallas, Oregon. Because of the number of employees involved, the Bauman, Coburg, and Dallas facility closures were all subject to requirements of the Worker Adjustment and Retraining Notification Act, 29 USC § 2101.09 ("WARN Act").[1] Weyerhaeuser maintained covered operations at both the Dallas and Coburg facilities throughout and, at reduced levels, beyond the 60-day WARN notification period.

5.  In or around December of 2008, Weyerhaeuser decided to close down the Albany facility as well.

---

[1] The WARN Act requires employers to provide notice 60 days in advance of covered plant closings and covered mass layoffs and has nothing to do with identifying dates under ERISA for withdrawal. An employer that closes a plant before the expiration of the 60-day notice period may be liable to the affected employees. 29 USC § 2104(a)(2)(A). However, there is no WARN Act liability if an employer pays wages to the employees in lieu of notice.

6.  By February 2009, Weyerhaeuser had actively engaged in communications with several potential purchasers for the sale of the Albany facility.  By March 17, 2009, Weyerhaeuser had a signed letter of intent for the sale of that facility.  Exhibit 1.[2]

7.  By March 31, 2009, Weyerhaeuser prepared what it refers to as a "Gate Memorandum" describing details of the process Weyerhaeuser had used to arrive at the sale of the Albany facility.  Exhibit 2.

8.  On April 16, 2009, Weyerhaeuser announced to employees that it would be shutting down the Albany facility and anticipated that it would continue to operate it until mid to late June 2009.  About 75 employees would be affected by the closure.  Weyerhaeuser's Human Resources Manager, Mike Stutzman, sent a letter to Mike Pieti, the Executive Secretary/Treasurer for Carpenters Industrial Council, the union that represented the Albany facility workers ( "Union"), regarding the planned shutdown.   Exhibit 3; *see also* Exhibit 4 (internal Weyerhaeuser communications about the April 16 announcement and the closure).

9.  Because of the number of employees at the Albany facility, the plant shutdown triggered requirements under the WARN Act.  Weyerhaeuser provided affected employees with notice under the WARN Act on April 16, 2009, and sent required notification to the Oregon Department of Community Colleges and Workforce Development.  Exhibit 5.

10.  The Fund's Board held a regularly scheduled meeting in Portland on April 23, 2009, and the Employer Trustees met on April 22 in preparation for that meeting.  Michelle Payne, a Weyerhaeuser employee and trustee, attended these meetings.  At those meetings, the Trustees were advised that investment losses in 2008 and 2009 would in all likelihood push the Fund into "critical" status and cause the Fund to have an estimated $30 million in unfunded vested liability

---

[2]  Exhibits cited are attached to the Stipulated Facts (Schwartz Decl., Ex. A).

as of the end of May 2009.  Thus, an employer that withdrew from the Fund during the Plan

Year commencing on June 1, 2009, would be assessed withdrawal liability.  Exhibit 6 (internal

Weyerhaeuser email correspondence concerning these meetings).

11.  Until the April 22-23 meetings, Weyerhaeuser was not previously aware that it

would incur withdrawal liability if it closed the Albany facility in June 2009 as planned.  The

Fund had no unfunded vested liability as of the end of the 2007-08 Plan Year.  Thus, an

employer that completely withdrew during the Plan Year ending on May 31, 2009 would not

incur withdrawal liability.

12.  On April 23, following the Board meetings, Payne emailed Weyerhaeuser

management concerning the potential withdrawal liability.  Exhibit 6, p. 1 (WC200008).

13.  On April 24, 2009, Su Suh, a Weyerhaeuser in-house attorney, requested information

potentially relevant to the calculation of Weyerhaeuser's potential withdrawal liability.  A

number of documents were provided to her by the end of April.  *See* Exhibit 7 (WC20010-17)

(communications between Weyerhaeuser and the Fund (or its attorneys or representatives) dated

April 24-27, 2009).  As Weyerhaeuser learned more information thereafter, it concluded that it

would not be subject to withdrawal liability if it ceased covered operations at the Albany facility

before May 31, 2009.

14.  Over the course of the next five weeks, Weyerhaeuser's outside counsel, Jeffrey

Robertson, had communications with the Fund's outside counsel, Charles Storke, that included

communication concerning the data necessary to estimate Weyerhaeuser's potential withdrawal

liability based on the projected termination date of June 2009.

15.  On May 28, 2009, Weyerhaeuser representatives met with Union representatives to

discuss the Albany facility shutdown.  At that meeting Weyerhaeuser representatives explained

that the Albany facility would cease operations before June 1, 2009 and asked the Union if it would agree to terminate the labor agreement before June 1, 2009. The Union refused. Weyerhaeuser and the Union signed a "Memorandum of Agreement." Exhibit 8.

16. On May 29, 2009 Weyerhaeuser advised the Albany facility employees that it would cease operations that day. Weyerhaeuser also ceased covered operations at its Coburg and Dallas facilities on May 29, 2009. Weyerhaeuser also advised the Fund that May 29, 2009, was the Albany facility's last day of operations. Weyerhaeuser accelerated the date of the closure of the Albany facility from the previously planned mid to late June time frame to prevent withdrawal liability.

17. No covered employees performed work at the Albany facility (or at the Coburg or Dallas facilities) after May 31, 2009. Weyerhaeuser made pension contributions to the Fund on May 29, 2009, for covered hours at the Albany, Dallas and Coburg facilities in the total amount of $46,583.08. Exhibit 9. Weyerhaeuser made an additional payment on June 17, 2009, in the amount of $609.74 stating "the remittance is for an additional 696.84 compensable hours for May which was discovered as part of Weyerhaeuser's regular internal review of all hours worked for fringe benefit remittance." Exhibit 10.

18. On June 4, 2010, the Board notified Weyerhaeuser that it had determined that Weyerhaeuser completely withdrew from the Plan in the June 1, 2009, through May 31, 2010, plan year and demanded payment of withdrawal liability in the amount of $3,887,090. Exhibit 11 (WC200061-66).

19. On September 1, 2010, Weyerhaeuser's attorney responded to the Board's demand for payment and requested a review of the Board's assessment that Weyerhaeuser owed withdrawal liability to the Fund. Exhibit 12 (BL000060-61).

20. On October 8, 2010, the Trust requested certain information so that the Board could further evaluate its assessment of withdrawal liability. Exhibit 13.

21. On November 19, 2010, Weyerhaeuser's attorney submitted certain information requested by the Board. Exhibit 14.

22. In a letter dated January 19, 2011, the Board's counsel informed Weyerhaeuser that after considering its request for review of withdrawal liability, it concluded that Weyerhaeuser's complete withdrawal occurred in June 2009, and that the assessment of withdrawal liability was correct. Exhibit 15.

23. On January 24, 2011, Weyerhaeuser initiated AAA arbitration.

24. On April 11, 2011, the Board issued a revised withdrawal liability assessment in the amount of $5,523,451.57. Exhibit 16. The parties stipulate that this is the total amount of any withdrawal liability (less amounts already paid by Weyerhaeuser as required under ERISA).

25. The Fund prepared a Summary Annual Report for the Plan year beginning June 1, 2009, and ending May 31, 2010. Exhibit 17.

## DISCUSSION

### I. Issues Raised by Weyerhaeuser

Weyerhaeuser ceased operations at its Coburg, Dallas, and Albany facilities on May 29, 2009, two days before the beginning of the June 1, 2008 – May 31, 2009 Plan year. The Plan had no unfunded vested liability as of May 31, 2008, the end of the 2007-08 Plan Year. Thus, an employer that completely withdrew during the Plan Year ending on May 31, 2009, would not incur withdrawal liability.

The Plan contends that Weyerhaeuser's complete withdrawal on May 29, 2009, should be ignored and that Weyerhaeuser's withdrawal liability must be calculated as though it withdrew in

mid-June 2009, because Weyerhaeuser accelerated its previously planned shutdown of the Albany facility in order to evade or avoid a significant unfunded vested liability in the Plan year commencing June 1, 2009.   The arbitrator agreed with the Plan's contention.

In support of its bid to vacate the Award, Weyerhaeuser raises four issues.  First, it contends that the closure of the Albany facility is not a "transaction" within the scope of ERISA § 4212(c).  Next, it contends that the principal purpose of its closure of the Albany facility was not to "evade or avoid liability."  Additionally, Weyerhaeuser contends that the arbitrator erred in failing to recognize the correct date of its withdrawal which was during the plan year ending May 31, 2009.  Finally, it contends that withdrawal liabilities are inappropriate on equitable grounds.  Accordingly, Weyerhaeuser asks this court to issue an order requiring the Plan to refund all amounts that Weyerhaeuser has been paying monthly to the Plan as withdrawal liability under ERISA.  This court agrees with Weyerhaeuser on the first three issues, obviating the need to consider the fourth issue.

## II.  <u>Standard of Review</u>

Under the MPPAA, findings of fact by an arbitrator are presumed correct, unless rebutted "by a clear preponderance of the evidence."  29 USC 1401(c).  However, the "arbitrator's conclusions of law are reviewed *de novo*."  *Penn Cent. Corp. v. Western Conf. of Teamsters Pension Tr. Fund*, 75 F3d 529, 533 (9th Cir 1996), quoting *CMSH Co., Inc. v. Carpenters Trust Fund*, 963 F2d 238, 240 (9th Cir), *cert denied*, 506 US 864 (1992).  Due to stipulated facts, this case turns on a single issue of law, namely the applicability of ERISA § 4212(c).

///

///

///

### III. <u>Analysis</u>

#### A. <u>ERISA § 4212(c)</u>

The first two of Weyerhaeuser's arguments are inextricably intertwined and will be considered together.  If ERISA § 4212(c) does not apply to the action taken by Weyerhaeuser in ceasing its operations at the Albany facility, then Weyerhaeuser has no withdrawal liability because it ceased all covered operations at the Albany facility and, thus, effected a "complete withdrawal" under ERISA § 4203(a)(2), 29 USC § 1383(a)(2), during the 2008-09 Plan year (ending May 31, 2009).  Accordingly, its liability would be calculated based on the previous (2007-08) Plan year when the parties stipulate that there were no unfunded vested liabilities. *Milwaukee Brewery Workers' Pension Plan*, 513 US at 417-18; 29 USC § 1391; Stipulated Fact 11.

#### 1. <u>Requirement of a Bilateral Agreement or Arrangement</u>

The MPPAA provides that a "complete withdrawal from a multiemployer plan occurs when an employer . . . permanently ceases all covered operations under the plan."  ERISA § 4203(a)(2).  It is undisputed that Weyerhaeuser effected a complete withdrawal from the Plan on May 29, 2009, when it closed the Albany facility.  However, the Plan seeks to impose withdrawal liability on Weyerhaeuser pursuant to ERISA § 4212(c) which provides as follows: "If a principal purpose of any transaction is to evade or avoid liability" under the MPPAA, then the MPPAA "shall be applied (and liability shall be determined and collected) without regard to such transaction."   According to the Plan, the early closure of the Albany facility was a "transaction" to "evade or avoid liability" which must be ignored when determining withdrawal liability.

The term "transaction" is not defined in the MPPAA and, unfortunately, one of the only cases discussing the issue circuitously defines "transaction" as the "act of transacting or fact of being transacted."  *SUPERVALU, Inc. v. Board of T'ees of Sw. Pa. and W. Md. Area Teamsters and Employers Pension Fund*, 500 F3d 334, 341 (3rd Cir 2007), *cert denied*, 552 US 1182 (2008), quoting AMERICAN HERITAGE DICTIONARY 1899-1900 (3d ed. 1992); *see also Lopresti v. Pace Press, Inc.*, 2012 WL 2263499 *12 (SDNY June 18, 2012) (quoting *SUPERVALU*).  That definition adds nothing to an understanding of the term as it is used in ERISA § 4212(c).

When considering the meaning of disputed terms, the Ninth Circuit relies on a variety of dictionaries.  *See, e.g.*, *United States v. Wing*, 682 F3d 861, 868 (9th Cir 2012), citing WEBSTER'S THIRD NEW INT'L DICTIONARY (1981) and the AMERICAN HERITAGE DICTIONARY (4th ed. 2000); *United States v. Leal-Vega*, 680 F3d 1160, 1167 (9th Cir 2012), *petition for cert filed* (US Oct. 1, 2012) (No. 12-6605), citing MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2005), BLACK'S LAW DICTIONARY (2009 ed.), the OXFORD ENGLISH DICTIONARY, and THE AMERICAN HERITAGE DICTIONARY (4th ed. 2000).  In those resources, the term "transaction" is variously defined as:

> 1. The act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract.  2. Something performed or carried out; a business agreement or exchange. 3. Any activity involving two or more persons.  4. Civil law.  An agreement that is intended by the parties to prevent or end a dispute and in which they make reciprocal concessions. La. Civ. Code art. 3071. — transactional, adj.

> Arm's-length transaction. 1. A transaction between two unrelated and unaffiliated parties. 2. A transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises.
> BLACK'S LAW DICTIONARY (9th ed. 2009)

> 1. The act of transacting or the fact of being transacted.
> 2. Something transacted, especially a business agreement or exchange.

3. Communication involving two or more people that affects all those
involved; personal interaction . . . .
THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th
ed. online).
http://www.ahdictionary.com/word/search.html?q=transaction
(accessed 10/24/2012)

1
a: something transacted; especially: an exchange or transfer of goods,
services, or funds <electronic transactions>
b plural: the often published record of the meeting of a society or
association
2
a: an act, process, or instance of transacting
b: a communicative action or activity involving two parties or things
that reciprocally affect or influence each other
MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2009)
http://www.merriam-webster.com/dictionary/transaction (accessed
10/24/2012)

1 an instance of buying or selling something: in an ordinary
commercial transaction a delivery date is essential
[mass noun] the action of conducting business: the transaction of
government business
an exchange or interaction between people: intellectual transactions in
the classroom
OXFORD DICTIONARIES (online)
http://oxforddictionaries.com/definition/english/transaction (accessed
10/24/2012)

The most recent case discussing ERISA § 4212 notes that "[t]he noun 'transaction'

means 'an act, process, or instance of transacting,' and the verb 'transact' means 'to prosecute

negotiations' or 'carry on business.'"   *Sun Capital Partners III, LP v. New England Teamsters*

*& Trucking Indus. Pension Fund*, 2012 WL 5197117, at *12 (D Mass Oct. 18, 2012), quoting

WEBSTER'S THIRD NEW INT'L DICTIONARY 2425 (1986) (addressing a transaction involving the

division of ownership so that no investment fund held greater than 80% to prevent an assertion of

common control).

These various dictionary definitions and the quote in *Sun Capital* make clear that the term "transaction" is not simply any and all business conduct.  According the term its plain meaning, it connotes *conducting*, rather than *ceasing*, business and connotes an event involving more than one party – in other words, a bilateral agreement or arrangement.  Weyerhaeuser's unilateral act of ceasing all covered operations at the Albany Facility involved neither.  Thus, this court concludes that Weyerhaeuser's cessation of all covered operations at the Albany facility was not a "transaction" within ERISA § 4212(c) because it was a *unilateral* act.

## 2.  Timing of a Transaction is Not Critical

Assuming for the sake of argument that a unilateral decision to cease all covered operations might constitute a "transaction," the arbitrator's decision is nevertheless flawed.  Both the Fund and the arbitrator defined the "transaction" at issue to include a temporal element: "Closing the facility on May 29, 2009, after the Union refused to terminate the labor agreement before June 1, 2009, is the transaction the Fund considered in applying ERISA § 4212(c)." Award, p. 9.  Moreover, the arbitrator found that Weyerhaeuser's "accelerated closing of the Albany facility was both a 'transaction' in itself, and part of the manner in which it closed and sold the facility."  Award, p. 10, citing *Sherwin-Williams v. New York State Teamsters Conf. Pension & Ret. Fund*, 158 F3d 387 (6th Cir 1998).  However, nothing in the statute, the legislative history, or the case law suggests that the *timing* – as opposed to the overall *nature and structure* – of the event in question can morph a *bona fide* complete withdrawal (by means of a cessation of all covered operations) into a "transaction to evade or avoid liability."

In enacting ERISA § 4212, Congress took aim at "'essentially fraudulent maneuvers lacking in economic substance'" by employers, not at *bona fide* cessations of all operations.  *Sun Capital Partners III LP*, 2012 WL 5197117, at *14, quoting *Cuyamaca Meats, Inc. v. San Diego*

*& Imperial Counties Butchers' & Food Employers' Pension Trust Fund*, 827 F2d 491, 499 (9th Cir 1987), *cert denied*, 485 US 1008 (1988).  Both *Cuyamaca* and *Sun Capital* relied on legislative history discussing the intended target of the "evade or avoid" provision:

> We intend that employers not be able to evade or avoid withdrawal liability through changes in identity, form, or control, or through transactions which are less than bona fide and arms' length.  Hence, for example, a building and construction industry employer – or for that matter any employer contributing to a plan – will not be able to evade withdrawal liability by going out of business and resuming business under a different identity.

126 Cong. Rec. 23038 (1980) (statement of Rep. Frank Thompson).

Each of the examples given in that legislative excerpt involve an employer who uses various artifices or schemes to deceptively structure its business operations.  Shortly after making that statement, Rep. Thompson clarified the intent of the partial withdrawal rules proposed in ERISA § 4205(b)(2)(A)(i), 29 USC § 1385(b)(2)(A)(i), observing that they were not intended to impose liability on *bona fide* cessations of operations:

> It is important to emphasize and to understand that in no case do these rules impose liability on an employer for merely ceasing or terminating an operation; rather they address only situations where work of the same type is continued by the employer but for which contributions to a plan which were required are no longer required.

126 Cong. Rec. 23040 (1980).

This excerpt further highlights the balance struck in the legislation by protecting *bona fide* business dealings, but not schemes and manipulations lacking economic substance.  The only conclusion supported by the record is that Weyerhaeuser's decision to close the Albany facility, as well as its Oregon mills, was a legitimate business decision due to the declining market in wood products.  Stipulated Facts 4 & 5.  The Plan does not argue that the closure was anything other than a *bona fide,* arms' length transaction, and the arbitrator so concluded.

Award, p. 14 ("Weyerhaeuser . . . had a legitimate business reason to close the facility.").

Nevertheless, the arbitrator considered the timing of the cessation of Weyerhaeuser's covered operations to be paramount, to the exclusion of the nature and structure of the action taken.

Weyerhauser admits that its later decision on April 16, 2009, to accelerate the date of the closure was made in order "to prevent withdrawal liability." Stipulated Fact 16. However, the record is undisputed that, other than the *timing*, nothing changed about what Weyerhaeuser proposed, planned, and ultimately did with regard to its operations at the Albany facility. This is not a situation where covered operations were continued with a skeleton crew, as in *Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.*, 872 F2d 208, 212-14 (9th Cir 1989), *cert denied*, 493 US 847 (1989). The record is undisputed that Weyerhaeuser ceased all covered operations on May 29, 2009, not only at the Albany facility, but also at the Coburg and Dallas facilities.

Nothing in the record supports the conclusion that the *nature* of the action taken by Weyerhaeuser changed. In December 2008 it intended to close the Albany facility, "plan[ned] to do so by late June 2009 or sooner," and was "working to sell all or part of the operation." Stipulated Facts, Ex. 4, pp. 1-2. The action Weyerhaeuser planned to take and actually took never changed; Weyerhaeuser merely executed that action a few weeks earlier than originally projected. Changing the date of a transaction does not create a new separate transaction.

Accepting the Plan's interpretation would require an employer to blindly ignore available information in timing any legitimate business decision. The essence of the Plan's argument is that Weyerhaeuser's fortuitous acquisition of information regarding its potential withdrawal liability if it did not completely cease all covered operations before the end of the 2008-09 Plan

year morphs its otherwise legitimate business decision to restructure its business operations by

closing the Albany facility into a "transaction to evade or avoid withdrawal liability."

  This simply cannot be squared with the Ninth Circuit's observation that running afoul of

ERISA § 4212(c) requires a sham transaction – *i.e.* changes in identity, form, control, or

transactions which are less than *bona fide* and arm's length.  "It is true that the purpose, and an

effect, of the May 5 offer was to delay the calculation of withdrawal liability until after June 30,

1983, and to thereby minimize such liability.  Such an effect, however, was not an evasion or

avoidance of withdrawal liability within the meaning of" ERISA§ 4212(c).  *Cuyamaca Meats*

827 F2d at 499.  In that case, one purpose of the employer's final offer during negotiations of a

new collective bargaining agreement was to minimize withdrawal liability.  Nonetheless, the

court found ERISA § 4124(c) inapplicable because the offer was *bona fide*, had economic

substance, was not deceptive in any way, and in no way frustrated the purpose of the MPPAA.

The Plan places heavy emphasis on the language in *Cuyamaca* to the effect that the "offer in no

way frustrated the purpose of the MPPAA."  *Id*.  However, the central holding of *Cuyamaca*, of

decisive import in this case, is that employers may time *bona fide* business transactions to

minimize withdrawal liability without fear of triggering ERISA § 4212(c).  As in *Cuyamaca*, the

"effect" of Weyerhaeuser's decision to accelerate the closure of its Albany facility was to

minimize its withdrawal liability.

  The Third Circuit's decision in *SUPERVALU* is noteworthy in this regard.  In that case,

the employer decided to close its facility for business reasons by late summer 2002.  The

employer realized that if it withdrew from the pension fund prior to June 30, 2002 (the last day

of the plan year), it would incur no withdrawal liability.  Therefore, it persuaded the Union to

agree to an early termination on June 29, 2002, of the existing collective bargaining agreement

("Termination Agreement"), although most employees continued working for another month.

The court concluded that the Termination Agreement violated ERISA § 4212(c) because "its

intention to evade or avoid withdrawal liability was a principal purpose, if not its only purpose."

*SUPERVALU*, 500 F3d at 342.  However, the court noted that it was *not* presented with "the

question of whether SUPERVALU could have withdrawn without liability before the end of the

2001-2002 plan year" under ERISA § 4212(c), which is precisely the question presented here.  *Id*

at 342 n8.  It also made a point of disclaiming reliance solely on the timing of the Termination

Agreement:

> We note that although the timing of SUPERVALU's withdrawal under the
> Termination Agreement was suspicious, our determination is not based on
> the fact that it withdrew on the last day of the 2001-2002 plan year.
> Rather, it is the transaction itself that violated the statute, regardless of
> what day SUPERVALU and the Union agree to terminate the obligation to
> contribute to the Fund.

*Id* at 342 n9.

The Plan argues that the manner in which an employer implements an otherwise

legitimate business decision, including not only how, but also when, may constitute a transaction

to evade or avoid withdrawal liability.  However, the cases which it cites involve transactions

that lacked economic substance.  In *Sherwin-Williams Co., supra*, the employer was held liable

for withdrawal liability under ERISA § 4212(c) by selling the company to a shell corporation

with no assets or corporate affiliations.  The arbitrator found that the employer knew that:  (1) the

sale of stock would, on its face, allow the employer to rid itself of its subsidiary without

triggering withdrawal liability; (2) the subsidiary could not survive without another entity

underwriting its monthly losses; (3) neither the subsidiary nor the buyer shell corporation was an

economically viable operating entity.  Although presented with other options for disposing of its

subsidiary, the employer chose the only one that would not subject it to withdrawal liability,

thereby violating the MPPAA.  Similarly in *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F3d 725 (7th Cir 1994), the employer sold the stock of the company to avoid triggering existing withdrawal liability, instead of selling its assets which was the more profitable option.  By exalting form over substance due to a concern over withdrawal liability, the court held that the transaction fell within ERISA § 4212(c).

Congress explicitly called on courts to "follow the substance rather than the form" of transactions in determining, assessing, and collecting withdrawal liability.  126 Cong. Rec. 23038 (1980).  "It is important to emphasize and to understand that in no case do these rules impose liability on an employer for merely ceasing or terminating an operation; rather, they address only situations where work of the same type is continued by the employer but for which contributions to a plan which were required are no longer required."  126 Cong. Rec. (Part 17) 23040 (August 25, 1980).  In other words, "merely ceasing or terminating an operation" does not trigger liability for a "partial" withdrawal.  In the same way, "merely ceasing or terminating an operation" should not and does not trigger liability when there is a complete withdrawal, absent some indication that the cessation of operations was deceptive and less than *bona fide* – ostensibly a cessation of operations but structured only as a sham to disguise continuing operations.

Even though Weyerhaeuser's closure of the Albany facility was expedited to prevent withdrawal liability, it did not pursue the selection of one structure over another to do so.  As repeatedly recognized in tax cases, "there is a material difference between structuring a real transaction in a particular way to provide a tax benefit (which is legitimate), and creating a transaction, without a business purpose, in order to create a tax benefit (which is illegitimate)." *Coltec Indus., Inc. v. United States*, 454 F3d 1340, 1357 (Fed Cir 2006), *cert denied*, 549 US

1206 (2007) (discussing cases evaluating the "economic substance" of various business arrangements). A similar distinction applies here when construing the MPPAA.

**B.  Conclusion**

In sum, the record does not support the application of ERISA § 4212(c) to Weyerhaeuser's May 29, 2009 cessation of covered operations at the Albany facility. No covered employees performed work at the Albany facility after May 31, 2009. Accordingly, Weyerhaeuser completely withdrew from the Plan prior to the Plan's June 1, 2009 – May 31, 2010 Plan year under ERISA § 4203 (a)(2). Weyerhaeuser's withdrawal liability, if any, must be calculated based on a complete withdrawal on or before May 31, 2009, and without regard to ERISA § 4212(c). As a result, this court has no need to consider Weyerhaeuser's alternative argument premised on the equities.

**ORDER**

For the reasons stated above, the March 1, 2012, Award in AAA Case No. 75 621 00020 11 DECR is VACATED. Weyerhaeuser shall submit a form of Judgment consistent with this Opinion and Order within 14 days.

DATED November 20, 2012.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge